IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DIANNA MAREK, | ) | |
| | ) | 8:08CV31 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| Michael Astrue, Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court for resolution of Dianna Marek's appeal of a final determination of the Commissioner of the Social Security Administration denying her application for disability insurance benefits and Supplemental Security Income ("SSI") under the Social Security Act. 42 U.S.C. §§ 401 et seq, 1381 et seq. This court has jurisdiction under 42 U.S.C. § 405(g). Upon review of the record and applicable law, the court reverses the final decision of the Commissioner and awards the plaintiff disability benefits in light of the findings below.

## BACKGROUND

Marek is a 43-year-old woman with a high school education. Social Security Transcript ("Tr.") at 36 & 409. She obtained her cosmetology license from Joseph's College of Beauty and worked as a cosmetologist for eleven years. Tr. at 410. Her past relevant work also includes working as a convenience store clerk. Tr. at 410. Marek alleges that she became disabled and unable to work on November 29, 2004. Tr. at 16. At the hearing, she testified that her disability is due to fibromyalgia, back problems, and mental health problems including bipolar, depression, anxiety, and attention deficit

hyperactivity disorder ("ADHD"). Tr. at 412-17. Dr. Monty Sellon currently serves as her primary care physician, and she also receives psychiatric treatment from Dr. Mohammad Shoiab. Tr. at 411-12.

Marek filed her Title II application for disability insurance benefits and a Title XVI application for SSI on December 3, 2004. Tr. at 77. The Social Security Administration initially denied both applications–first on April 14, 2005, and again upon reconsideration on May 27, 2005. Tr. at 40 & 46. On July 12, 2005, Marek filed a Request for Hearing by an Administrative Law Judge. Tr. at 34. The Administrative Law Judge ("ALJ") heard Marek's claim on December 13, 2006. Tr. at 53. He denied benefits on May 23, 2007. Tr. at 16. On June 14, 2007, Marek filed a Request for Review of the Hearing Decision by the Appeals Council. Tr. at 10. The Appeals Council denied her Request for Review on November 28, 2007, making the ALJ's decision the final decision of the Commissioner. Tr. at 5. Marek then timely filed her complaint in this court. *See* Filing No. 1.

At her hearing, Marek testified that due to her disabilities, she cannot walk around an entire block and must lean on something if she is standing. Tr. at 419-20. She also testified that she can only take short trips to the grocery store three times a month because the trips include a considerable amount of time walking and standing in line. Tr. at 420. In describing her mental conditions, Marek testified that her bipolar disorder causes severe mood swings and as a result she is quick to anger at the smallest things. Tr. at 415. In regards to her depression, Marek testified that she experiences suicidal thoughts. Tr. at 416. Sometimes she feels really down and hides in her bedroom as often as three times a week. Tr. at 416. Further, Marek testified that as a result of her anxiety, she has

problems being around crowds of people and strangers, and self-mutilates by constantly biting her fingers until they bleed. Tr. at 416-17.

On June 10, 2002, Marek was admitted to Immanuel Medical Center in Omaha, Nebraska, through the emergency room for psychiatric evaluation. Tr. at 182. Upon admission, she reported suicidal ideation and that she had a plan to kill herself with carbon monoxide poisoning. When the hospital discharged Marek on June 13, 2002, they diagnosed her with the following: bipolar-affective disorder type II, methamphetamine dependence in remission, and a GAF score of 30 and 60.[1]

Marek currently receives care from her treating physician, Dr. Sellon, on a monthly basis. Tr. at 330. Dr. Sellon treats her for her fibromyalgia, chronic pain syndrome, degenerative disc disease of the spine, and osteoarthritis. Tr. at 330. During the course of her treatment, Dr. Sellon has consistently noted that Marek's subjective complaints of pain align with 18 out of the 18 paired trigger points that are commonly known to be consistent with fibromyalgia. Tr. at 330.

On April 1, 2005, Dr. Patricia J. Blake, Ph.D., conducted a consultative psychological examination at the request of the Disability Determination Service ("DDS"). Tr. at 267. In her notes, Dr. Blake reported that plaintiff presented an unkempt and disheveled appearance. Tr. at 267. Marek was alert and oriented with only slightly impaired speech. Tr. at 267. Dr. Blake's examination revealed that Marek was oriented

---

[1] The Global Assessment of Functioning ("GAF") Scale is a rating system for reporting the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision (DSM-IV-TR) 34 (4th ed. 2000). A score of 50 or lower indicates "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (e.g., no friends, inability to keep job)." *Id.* at 34.

and cooperative, but Dr. Blake remarked that she appeared somewhat sedated. Tr. at 269. Her mood was depressed and her affect was flat. Tr. at 269. Dr. Blake noted no observable signs of tension, anxiety, or psychomotor disturbance. Tr. at 269. Dr. Blake opined that Marek's flat affect and variable response to her toddler may have indicated substance abuse. Tr. at 269. Upon examination, Dr. Blake did not believe Marek was restricted in daily activities by her mental health issues. Tr. at 269. Dr. Blake reasoned that Marek had the ability to carry out short and simple instructions under ordinary supervision. Tr. at 269. Dr. Blake further concluded that Marek appeared to be able to relate appropriately to coworkers and supervisors and adapt to changes in her environment. Tr. at 269-70. At the conclusion of her examination, Dr. Blake diagnosed amphetamine dependence in full sustained remission by report, pain disorder, rule out amphetamine-induced mood disorder, and rule out opioid dependence. Tr. at 270. She also diagnosed a personality disorder and assessed a GAF score of 60, indicating mild to moderate symptoms. Tr. at 270. Dr. Blake did not conclude that Marek met the criteria for bipolar disorder. Tr. at 270.

Dr. Sellon, Marek's treating physician, referred her to Excel Physical Therapy to work with a physical therapist. Marek began physical therapy on January 4, 2006. Tr. at 292. In a letter to Dr. Sellon, Mr. Zach Girthoffer, Marek's physical therapist, noted that her pain is "consistent with fibromyalgia – type pain or chronic pain." Tr. at 292. Her discharge letter stated that out of twelve visits, Marek had canceled three times and failed to appear for her scheduled therapy appointments two times. Tr. 288. In Mr. Girthoffer's final letter to Dr. Sellon, he explained that as a result of the therapy treatment, Marek had not shown much improvement and continued to complain of pain throughout her upper and lower

back. Tr. at 288.  He recommended that "other forms of treatment may be indicated for Dianna at this time in order to address her pain."  Tr. at 288.

The DDS performed a mental Residual Functional Capacity ("RFC") assessment on April 12, 2005.  Tr. at 170.  Dr. Linda Schmechel, Ph.D., found that Marek was moderately limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; to maintain socially appropriately behavior; and to adhere to basic standards of neatness and cleanliness and the ability to set realistic goals or make plans independently of others.  Tr. at 166-67.

Dr. Allen Hohensee, at the request of DDS, also performed a physical RFC assessment on April 13, 2005.  Dr. Allen Hohensee placed the following restrictions on Marek: lifting of 10 pounds or less; only occasional use of stairs; sitting, standing, and walking for six out of eight hours; and avoiding concentrated exposure to hazards, extreme heat and cold, wetness, humidity, and vibrations.  Tr. at 173-79.

Marek first saw her treating physician, psychiatrist Dr. Shoiab, M.D., on April 23, 2005.  Tr. at 285-86.  Dr. Shoiab described her as anxious, but stated that she sat comfortably in the chair.  Tr. at 286.  She described her mood as "okay right now," but she stated that she got depressed at times.  Tr. at 286.  Dr. Shoiab described her affect as appropriate.  Tr. at 286.  She reported no suicidal or homicidal ideas, and denied auditory hallucinations or other psychotic symptoms.  Tr. at 286.  At that time, Dr. Shoiab diagnosed

5

Marek with bipolar I disorder and post-traumatic stress disorder, and he continued her medications.  Tr. at 286.

On May 27, 2005, Marek told Dr. Sellon that she was traveling to Arizona to visit her sister who was ill, and she wanted to increase her Percocet; at that time, she was already taking 10 pills a day.  Tr. at 328.  Dr. Sellon approved an increase to 12 a day for one month.  Tr. at 328.  She was still taking up to four OxyContin a day as well.  Tr. at 328.

In June 2005, Dr. Sellon decreased Marek's Percocet back to 10 a day, but increased her OxyContin to 5 a day.  Tr. at 328.  In July 2005, Marek reported a pain level of 8/10, despite the recent increase in her medications. Tr. at 328.  Dr. Sellon stated that Marek required narcotics to manage her fibromyalgia symptoms; he further stated that it was his medical opinion that nothing else worked even though "she has been tried on everything that one can think of."  Tr. at 328.  Dr. Sellon reasoned his only option was to increase all of her medications.  Tr. at 328.  Thus, he added Duragesic to Marek's list of medications.  Tr. at 328.

On August 18, 2005, Dr. Shoiab, her consulting physician, performed a mental examination and gave her a diagnosis that included bipolar disorder by history, post-traumatic stress disorder by history, and assessed a GAF of about 51.  Tr. at 280.  Dr. Shoib noted that Marek reported doing better.  Tr. at 280-81.  Her sleep and anxiety were better.  Tr. at 281.  He discontinued her Wellbutrin based on her reports that it was putting aggressive impulses in her mind.  Tr. at 281.  Marek's blood test revealed that she was not taking her prescribed Depakote, so Dr. Shoiab reduced that prescription.  Tr. at 347.

Dr. Shoib's evaluation dated September 29, 2005, reported an unremarkable mental status examination. Tr. at 277. He discontinued her Remeron, and added Trazadone and Cymbalta. Tr. at 277.

When she visited Dr. Sellon in October of 2005, Marek reported that her pain was as controlled as it had ever been. Tr. at 317. She said that she had attention deficit hyperactivity disorder ("ADHD") since she was five years old and was having trouble with concentration. Tr. at 315. Dr. Sellon prescribed Ritalin. Tr. at 315.

On January 13, 2006, Marek reported to Dr. Sellon that she was doing well on her current medications, and that her neck pain was a little better after physical therapy. Tr. at 297. Her examination was unremarkable except for the fact that her subjective complaints of pain again, as they consistently had during her course of treatment with Dr. Sellon, still corresponded with18 out of the total clinically acknowledged 18 fibromyalgia trigger points. Tr. at 297. Dr. Sellon continued Marek's prescriptions of Ritalin, Duragesic, OxyContin, and Percocet. Tr. at 297. In February 2006, Dr. Sellon's examination of Marek was normal except for some tenderness in the low back. Tr. at 297. Dr. Sellon increased her OxyContin and decreased her Percocet. Tr. at 297. He noted that his goal was to control her pain and reduce the amount of pain medication required to control her pain. Tr. at 297.

On February 9, 2006, Marek had an MRI on her lumbar spine. The resulting impression described minimal broad disc bulges, L4-5 and L5-S1, mild degenerative changes involving the facets from L3-4 through L5-S1, and no evidence of focal disc extrusion or spinal stenosis. Tr. at 295. On March 7, 2006, Dr. H. Randal Woodward, a treating physician who Marek saw just on this one occasion, reviewed the results of the

MRI with Marek at the Nebraska Spine Center. In his assessment, he stated that he believed Marek's problems were mostly psychiatric. Tr. at 336. Dr. Woodward did note that Marek has minimal arthritis in the lower back and recommended that she work with a psychiatrist. Tr. at 336.

On March 13, 2006, when Marek saw her Dr. Shoiab, her treating physician, she stated that she was doing "a lot better" on her current medication. Tr. at 342. She reported some periods of depression, but stated that she was able to come out of them. Tr. at 342. Her mental status examination was unremarkable. Tr. at 342.

On March 31, 2006, Dr. Sellon noted that Marek was very disappointed after seeing Dr. Woodward because he had told her there was nothing he could do for her chronic back pain. Tr. at 313. Dr. Sellon agreed with Dr. Woodward that there was a large psychological component to Marek's pain, but reasoned that she also had real, physical symptoms that required treatment. Tr. at 313. He prescribed a total of 300 milligrams a day of OxyContin, an increase from Marek's October 2005 dosage of 80 milligrams per day. Tr. at 313 & 317. He also increased her Duragesic dosage, but decreased her Percocet dosage back to eight pills a day. Tr. at 313.

Marek had a left wrist MRI done on April 28, 2006. Tr. at 312. The results indicated a triangular fibrocartilage complex tear and a contusion or osteochondral lesion. Tr. at 312. She reported to Dr. Sellon that her pain had improved with the medication changes, and described her pain as "controlled." Tr. at 311. She stated that she had "not felt this good in some time," and she was able to do things with her son rather than just lying around. Tr. at 311.

On May 24, 2006, Dr. Sellon observed that Marek did not appear overly medicated and he saw no reason not to continue her pain medications. Tr. at 300. At that time, Marek reported that she had cut back on her Percocet from 300 a month to 260 a month. Tr. at 300. When Marek saw Dr. Sellon in early August of 2006, he noted that she denied any significant side effects from her medications. Dr. Sellon noted: "we have tried every other plausible non-narcotic treatment for her pain and it has not worked." Tr. at 394.

On August 31, 2006, Dr. Sellon noted that Marek would be dependent on her medications "no matter how much we give her and we need to give her enough to relieve her pain or it is worthless even using the meds." Tr. at 393. Dr. Sellon increased her OxyContin to 360 milligrams a day, and reduced her Percocet back to six a day. Tr. at 393.

In Dr. Sellon's October 29, 2006, "Physician's Confidential Report" he describes Marek's permanent conditions and the limitations of her ability to work. Specifically, he concludes that Marek suffers from:

> [c]hronic unremitting back pain and fibromyalgia. Because of the fibromyalgia, she also has significant daytime fatigue. The patient reports that she is unable to sit at a desk for any length of time. She has chronic neck pain and [is] required to spend at least [three quarters] of the day having to prop her feet up and be off of her feet because of the pain.

Tr. at 388. On November 24, 2006, Dr. Sellon sent a letter to Marek's attorney. He stated the following:

> Dianna has suffered from severe fibromyalgia and back pain for years, several years prior to me assuming her care. She has the diagnosis of degenerative disc disease of the spine, fibromyalgia, osteoarthritis and a history of sciatica. The patient has extreme difficulty in sitting or standing for more than 10 to 15 minutes at a time. She is also unable to lift more than 10 pounds due to this condition. As is typical for fibromyalgia, her condition fluctuates, she has good and bad days. With a reasonable degree of

> medical certainty I feel the patient does suffer from the above conditions and they do limit her ability to perform any type of repetitive activities. She does require frequent position changes to accommodate her pain.

Tr. at 378.

## ALJ's Findings

The ALJ evaluated Marek's claim for disability insurance benefits and SSI benefits according to the well-known Five-Step Sequential Evaluation. 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920(a)-(g). The ALJ concluded that Marek met the "insured status requirements of the Social Security Act through March 31, 2009." Tr. at 18. He then found that Marek had "not engaged in substantial gainful activity since November 29, 2004, the alleged onset date" of her disability. Tr. at 18. The ALJ further found that Marek has the following severe impairments: "bipolar disorder; depressive disorder NOS; degenerative disc disease (L4-5, L5-S1; degenerative joint disease, mild, L3-4, 4-5, L5-S1); osteoarthritis; anxiety with phobias; fibromyalgia; left wrist injury; triangular fibrocartilage derangement, status post arthroscopy and debridement (May 2006); narcotic dependency/abuse (20 CFR 404.1520(c) and 416.920(c))." Tr. at 18.

Upon reviewing her record, however, the ALJ concluded that Marek "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I." Tr. at 19. Consequently, the ALJ had to review Marek's RFC to perform other work. Based on the testimony of the Vocational Expert ("VE") at the hearing, the ALJ found that:

> The claimant has the residual functional capacity to perform sedentary work; being able to use her left hand (dominant hand – although there is one reference in the file to her being ambidextrous) for handling, fingering, and feeling limited to lifting 1 lb. under any circumstances (although she can assist in lifting with the left, if the right hand is the primary weight lifter), as

well as no power gripping with the left hand; no use of air or vibrating tools, no operating motor vehicles; no repetitive pushing/pulling; with frequent bending, twisting, turning; frequent stooping; occasional climbing, kneeling, crawling, and squatting; no reaching above shoulder level with either upper extremity; no standing more than 20 minutes at one time; while sitting, she must be able to shift in place, and not take her away from work responsibilities; she needs to be able to stand and stretch, standing and stretching every half hour, not taking more than 30 – 45 seconds to do shifting or stretching, and not requiring she leave the work station; with no unprotected heights; slightly limited ability to interact with the public (at the unskilled level), and if th[e] contact with the public is brief and superficial and doesn't involve more than handing out flyers or circulars, then there is no limitation; slight to moderate limitation in responding to work pressure and to changes in a usual work setting at the unskilled level; and moderately limited ability to understand, remember and carry out detailed instruction at the unskilled level. Additionally, she has moderate to marked limitation in ability, at the semi-skilled level, has no limitation in understand, remember or carry our short, simple job instructions.

Tr. at 18-21. In reaching this conclusion, the ALJ found that Marek's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." Tr. at 22. To support this RFC determination, the ALJ also had to discredit Dr. Sellon, whose medical opinions contradict the information in the hypothetical upon which the VE based her testimony on at the hearing. In discrediting Dr. Sellon, the AlJ stated that the "record strongly suggests drug-seeking and overuse, and probably abuse and dependence. . . [Dr. Sellon] states the claimant is seeing 'multiple pain specialists,' but no reports are in the medical evidence or record with objective findings supporting her complaints." Tr. at 22-23 (internal citations omitted). The ALJ reasoned that Dr. Sellon's prescribed medical treatment "clearly does not make sense." Tr. at 23. Consequently, the ALJ declined to adopt the medical findings of Marek's treating physician.

Continuing with his decision, the ALJ found that Marek is now "unable to perform any past relevant work." Tr. at 23. Based on his finding of Marek's RFC, the ALJ then

concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." Tr. at 24.

As a result, the ALJ reasoned that Marek "is not disabled under sections 216(I) and 223(d) of the Social Security Act." Tr. at 25.

## STATEMENT OF THE ISSUES

Marek appeals the final decision of the Commissioner denying her benefits. In her appeal, she avers that (1) the ALJ erred by making his RFC determination based on his opinion rather than the medical evidence in the record; (2) the ALJ erred by posing inaccurate hypothetical questions to the vocational expert; and (3) the ALJ failed to properly analyze Marek's credibility. Marek argues the court should remand this case to the Social Security Administration for further hearing.

## STANDARD OF REVIEW

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder, re-weigh the evidence, or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support a decision." *Cox v. Apfel*, 160 F.3d 1203, 1206-07 (8th Cir. 1998). In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the [Commissioner's] decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999) (internal quotations omitted).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a) (1998); *Cox,* 160 F.3d at 1206. Under the Commissioner's regulations, the determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's RFC and his or her age, education and work experience. 20 C.F.R. § 404.1520(a); *Flanery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997). The Commissioner determines: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. *Cox,* 160 F.3d at 1206.

At step three of the sequential evaluation, if the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience. *Flanery,* 112 F.3d at 349. The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. §§ 404.1525(a), 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

**LAW & ANALYSIS**

Upon review of the record, the court concludes that the substantial evidence in the record does not support the ALJ's decision, and therefore the court reverses the decision of the Commissioner and instructs the Commissioner to award the plaintiff her benefits.

    **1.    The ALJ's Failure to Rely on Medical Evidence in the Record in his RFC Determination**

Marek contends that the ALJ erred when he failed to consider the medical testimony of her treating physician, Dr. Sellon, in forming his conclusion regarding her RFC to perform other work. The court has reviewed the record and finds that the ALJ did err when he determined Marek's RFC because he failed to rely on the substantial medical evidence in the record. In determining Marek's RFC, the ALJ should have given substantial weight to the medical opinions of her treating physician, Dr. Sellon. While the ALJ rejected the credibility of Dr. Sellon, he based his rejection of Dr. Sellon on his own opinion that Dr. Sellon over-prescribed medications to Marek. The AlJ's opinion in this instance, however, is medical in nature. Because the ALJ is not a medical expert, such an opinion requires support from medical evidence in the record. The record, however, indicates no medical evidence exists to support the ALJ's opinion that Dr. Sellon over-prescribed medications to Marek. No other treating physicians or consulting physicians who saw Marek came to the conclusion that Marek was overly-medicated. Consequently, the ALJ has erred in discounting Dr. Sellon's medical opinions of Marek's condition.

"Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, we have also stated that a claimant's residual functional capacity is a *medical question*," *Baldwin v. Barnhart*, 349

F.3d 549, 556 (8th Cir. 2003) (internal citations and quotations omitted) (emphasis added). "[S]ome medical evidence must support the determination of the claimant's RFC. . . . In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." *Id.* at 556 (internal citations and quotations omitted). If the ALJ wishes to adopt the medical conclusion that Marek is overly-medicated, he must cite "some medical evidence" in the record to support this conclusion. No evidence from a medical professional in the record fully substantiates the ALJ's conclusion that Dr. Sellon over-medicated Marek and, thus, is not a credible resource in determining her RFC to perform other work.

As her treating physician, Dr. Sellon's opinion, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" should be given controlling weight.[2] *Reed v. Barnhart,* 399 F.3d 917, 920 (8th Cir. 2005); 20 C.F.R. § 416.927(d)(2). The treating physician's opinion is given this weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2). A treating physician's opinion, however, "does not automatically control,

---

[2] The regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments." § 416.927(a)(2). "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source" who provides the claimant with medical treatment or evaluation on an ongoing basis. § 416.902. By definition then, the controlling weight afforded to a "treating source" "medical opinion" is reserved for the medical opinions of the claimant's own physician, psychologist, and other acceptable medical source. The opinions of other medical professionals, though not "treating sources" as defined in the regulations, can be afforded treating source status if associated with a physician, psychologist, or other acceptable medical source as part of a team approach to treatment. *See Shontos v. Barnhart,* 328 F.3d 418, 426 (8th Cir. 2003) (giving treating source status to the group of medical professionals, including therapists and nurse practitioners who worked with claimant's psychologist, where the treatment center used a team approach).

since the record must be evaluated as a whole." *Reed,* 399 F.3d at 920. Instead, the Eighth Circuit Court of Appeals has "upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* at 920-21. Thus, "the regulations also provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).

The record in this matter, however, shows no significant evidence of inconsistent opinions or opinions from other medical professionals that undermine the credibility of Dr. Sellon. The ALJ has not relied on any other "better or more thorough medical evidence" to conclude that Dr. Sellon's opinion regarding Marek's physical limitations is not credible. While some consulting phsyicians mentioned concerns that some of Marek's medications might interact and cause seizures, that does not give rise to the ALJ's conclusion that Dr. Sellon has therefore overly-medicated Marek. Further, the ALJ contends that Dr. Sellon has no objective medical evidence of Marek's pain save her subjective complaints, although Dr. Sellon has consistently noted that Marek's subjective complaints of pain align with 18 out of the 18 paired trigger points consistent with fibromyalgia. Tr. at 330. The substantial evidence in the record, therefore, does not support the ALJ's decision.

### 2.    The Inaccurate Hypotheticals Posed to the Vocational Expert

Marek further alleges the ALJ erred when he relied on an inaccurate hypothetical posed to the VE. Marek avers that the hypothetical the ALJ posed to the VE was inaccurate because the ALJ did not use Dr. Sellon's medical evidence that Marek cannot

16

stand or sit for more than fifteen minutes at one time, and instead gave the VE a hypothetical with the faulty premise that the theoretical individual could stand or sit for no more than *twenty* minutes.  Because this inaccuracy in the posed hypothetical is not supported by the substantial evidence in the record, the court finds that the ALJ erred in relying on the VE's testimony.

"Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question.  When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (internal citations and quotations omitted).  Consequently, testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Commissioner's decision.  *Id.*

Because the VE's testimony was based on hypothetical questions that do not "encompass all" of Marek's "relevant impairments," the testimony of the VE in response to the ALJ's proposed hypothetical does not constitute substantial evidence.  Further, the court finds it important to note that when Marek's Counsel gave the VE a hypothetical that contained all of Marek's limitations (in accordance with the medical opinion of her treating physician), the VE listed only possible occupations for Marek– for which the ALJ concluded that significant jobs in the national and regional economy did not exist. Tr. at 440-441. Accordingly, the court concludes that the ALJ's determinations based upon the VE's testimony were reached in error, and thus, the court reverses the final decision of the Commissioner.

### 3. The ALJ's Failure to Properly Analyze Marek's Credibility

Finally, Marek contends that the ALJ erred in dismissing the credibility of her subjective complaints of pain. Given that the court has already found the ALJ's decision to be in error because he failed to rely on medical evidence in determining Marek's RFC and he posed inaccurate hypotheticals to the VE, the court finds the question of her credibility is now a moot issue.

Instead, the court limits its reversal to the consideration of Dr. Sellon's medical evidence in the record and the improper hypothetical posed to the VE that failed to include all of Marek's limitations.

### CONCLUSION

Because the evidence upon which the ALJ has based his decision is flawed, and because he has erred in failing to consider the substantial medical evidence in the record, this court concludes that "it would not be possible for any reasonable fact-finder to come to the conclusion reached by the [ALJ]." *Barnett v. Barnhart,* 362 F.3d 1020, 1022 (8th Cir. 2004). Consequently, reversal of the Commissioner's final decision denying benefits is proper.

If the record presented to the ALJ contains substantial evidence supporting a finding of disability, a reviewing court may reverse and remand the case for entry of an order granting benefits to the claimant. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir. 1984). "Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir. 1992). When plaintiff's counsel presented a complete hypothetical that included all of Marek's physical limitations in

accordance with the medical opinions of her treating physician, the VE listed only one job Marek could perform. The ALJ concluded this one job did not exist in significant numbers in the national economy. *See* Tr. at 440-441. Therefore, in this case, the substantial evidence supporting a finding of disability is quite clear. Under the circumstances, further hearings would merely delay benefits; accordingly, an order granting benefits is appropriate. *Thompson,* 957 F.2d at 614 ("Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate.").

The court finds that Marek is disabled under the Social Security Act and reverses the final decision of the Commissioner. Accordingly,

IT IS ORDERED:

1. The decision of the Commissioner is reversed; and
2. This action is remanded to the Commissioner with instructions to award benefits.

DATED this 9th day of February, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge